# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| MONEESHA KAMANI,<br><br>    Appellant,<br><br> v.<br><br>MICHAEL A. STONE, DVM, and his marital community/domestic partnership; NVA AETC VETERINARY MANAGEMENT, LLC dba ANIMAL EMERGENCY AND SPECIALTY CENTER, a foreign limited liability company,<br><br>    Respondent. | No. 59601-6-II<br><br><br><br>ORDER CORRECTING OPINION AND DENYING REMAINDER OF MOTION FOR RECONSIDERATION |

Appellant, Moneesha Kamani, filed a motion for reconsideration of this court's unpublished opinion filed on April 22, 2025. After consideration, it is hereby

**ORDERED** that the opinion is corrected as follows:

On page 3 of the opinion, the sentence that states: "Bella's syncopal episodes began in June." is corrected to read: "Bella's syncopal episodes began in May."

It is hereby further

**ORDERED** that the opinion is corrected as follows:

On page 3 of the opinion, the sentence that states: "In a note, Hidden Springs prescribed sildenafil 20mg PO every 12 hours for pulmonary hypertension." is corrected to read: "In its

No. 59601-6-II

record, Hidden Springs noted that WestVet prescribed sildenafil 20mg PO every 12 hours for

pulmonary hypertension."

It is hereby further

**ORDERED** that the remainder of the motion for reconsideration is denied.

FOR THE COURT: Jj. Lee, Cruser, Che

J., J

Lee, J.

We concur:

Cruser, C.J.

Che, J.

2

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| MONEESHA KAMANI, | No. 59601-6-II |
| Appellant, | |
| v. | |
| MICHAEL A. STONE, DVM, and his marital community/domestic partnership; NVA AETC VETERINARY MANAGEMENT, LLC dba ANIMAL EMERGENCY AND SPECIALTY CENTER, a foreign limited liability company, | UNPUBLISHED OPINION |
| Respondents. | |

LEE, J. — Plaintiff Moneesha Kamani appeals from the trial court's grant of partial summary judgment in favor of defendants Michael Stone and Animal Emergency and Specialty Center (AESC). Kamani argues the trial court erred by dismissing her outrage claims, fraud claims, and breach of contract claim. Kamani further argues that since the trial court erred in dismissing her claims of outrage and claims of fraud, it also erred when it found Kamani may not recover noneconomic damages or wage loss damages. Lastly, Kamani argues that the trial court erred in denying her motion for reconsideration.

We affirm the trial court's dismissal of Kamani's outrage claims, fraud claims, and the breach of contract claim. Accordingly, we also affirm the trial court's ruling that Kamani may not recover noneconomic and economic damages arising from those claims. Finally, because Kamani

fails to present any argument with regard to the motion for reconsideration, we affirm the trial court's denial of Kamani's motion for reconsideration.

## FACTS

This case arises from the passing of Kamani's 14-year-old Pekingese, Bella. Bella was treated on December 31, 2022, by Michael Stone, DVM,[1] at AESC in Poulsbo, Washington. Following Bella's passing, Kamani sued Stone, alleging veterinary negligence, outrage, and fraud. Kamani also sued AESC, alleging veterinary negligence, outrage, fraud, and breach of contract. The trial court dismissed all but the veterinary negligence claims on summary judgment.

A. BELLA'S MEDICAL HISTORY

In May 2022, when Kamani was living in Idaho, a veterinarian told Kamani that Bella might be suffering from congestive heart failure. The veterinarian prescribed medications intended to treat congestive heart failure.

On May 9, when Bella did not improve, Kamani took her to WestVet. WestVet noted possible congestive heart failure or pulmonary hypertension and recommended hospitalization, oxygen, a cardiology consult, and an echocardiogram with an electrocardiogram to confirm a diagnosis.[2] Kamani was initially hesitant to move forward with the consult and the procedure, but she later approved both.

---

[1] DVM is doctor of veterinary medicine. *Veterinarian Credentials and What They Signify*, BELLE MEAD ANIMAL HOSPITAL, (Jan. 15, 2022), https://www.bellemeadanimalhospital.com/blog/veterinarian-credentials-and-what-they-signify/, (last visited Apr. 14, 2025).

[2] In the record, electrocardiogram is noted as ECG. An ECG is used to record electrical signals from the heart. *Electrocardiogram (ECG or EKG)*, MAYO CLINIC, (Apr. 2, 2024), https://www.mayoclinic.org/tests-procedures/ekg/about/pac-20384983, (last visited Apr. 8, 2025).

WestVet admitted Bella and treated Bella with oxygen that same day. The echocardiogram and electrocardiogram confirmed that Bella had mild mitral valve disease/tricuspid valve displasia (MVD/TVD)[3] and mild/moderate pulmonary hypertension.[4] Bella continued to receive oxygen treatment and stayed at WestVet until discharge on May 12.

Bella's syncopal[5] episodes began in June. On June 1, Kamani called Hidden Springs Animal Hospital, requesting a house call to check Bella and confirm that Bella was doing ok. In a note, Hidden Springs prescribed sildenafil 20mg PO[6] every 12 hours for pulmonary hypertension.

---

An echocardiogram is a diagnostic test that takes detailed pictures of the heart. *Echocardiogram*, MAYO CLINIC, (Nov. 12, 2024), https://www.mayoclinic.org/tests-procedures/echocardiogram/about/pac-20393856, (last visited Apr. 14, 2025).

The echocardiogram and ECG would have determined if Bella had congestive heart failure or pulmonary hypertension.

[3] MVD refers to the degeneration, thickening, and subsequent leaking of the valve separating the left atrium and left ventricle of the dog's heart and is common in older dogs, often detected through a heart murmur. *Mitral Valve Disease in Dogs*, PETMD, (Jun. 21, 2023), https://www.petmd.com/dog/conditions/cardiovascular/mitral-valve-disease-dogs, (last visited Apr. 9, 2025).

TVD is a congenital malformation of the tricuspid valve allowing backwards blood flow which causes volume overload to the right heart. *Tricuspid Valve Dysplasia in Dogs*, CVCA, https://www.cvcavets.com/tricuspid-valve-dysplasia/, (last visited Apr. 14, 2025).

[4] Pulmonary hypertension is an elevated blood pressure within the vasculature of the lungs. It can lead to decreased blood flow to the left side of the heart for release and can cause decreased oxygenation of blood.

[5] Syncope refers to fainting or passing out, typically caused by a temporary loss of oxygen to the brain. It is usually an indication of structural heart disease or arrhythmias. Bella's syncope was likely due to Bella's pulmonary hypertension.

[6] Sildenafil is medication to treat clinical signs of pulmonary hypertension, like syncope. *Sildenafil for Dogs and Cats*, PET MD, (Jan. 23, 2023),

From September to December, Bella experienced 10 to 13 syncope episodes that lasted four-to-five seconds.

On November 23, after relocating to Washington, Kamani e-mailed Olympic Veterinary Cardiology, requesting a consult for Bella's cough and syncope.

On December 19, Kamani visited the Veterinary Referral Center of Central Oregon (VRCCO) for Bella's syncopal episodes. VRCCO completed diagnostic testing, and of the several problems identified, it found: (1) mildly elevated red blood cell count, likely secondary to chronic hypoxia (decreased oxygen from upper airway disease); (2) mildly elevated liver enzymes, which could be suggestive of several diagnoses, notably of cardiac disease or chronic upper airway disease; and (3) progressive pulmonary hypotension based on progressive changes in Bella's echocardiogram. VRCCO recommended following up with a cardiologist in Portland.

On December 22, Cascade Veterinary diagnosed Bella with progressive pulmonary hypertension and noted a concern that Bella could develop "more fulminant[7] symptoms." Clerk's Papers (CP) at 193.

---

https://www.petmd.com/pet-medication/sildenafil-dogs-and-cats#:~:text=Sildenafil%20is%20used%20in%20dogs%20and%20cats%20to,megaesophagus%20and%20myxomatous%20mitral%20valve%20disease%20in%20dogs, (last visited Apr. 14, 2025).

PO stands for "Per Os" which means medication to be taken by mouth or orally. *PO Medical Abbreviation*, ALL ACRONYMS, https://www.allacronyms.com/PO/medical, (last visited Apr. 14, 2025).

[7] "Fulminant" describes something coming on suddenly and with great severity. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, 920 (2002).

B.    TREATMENT AT AESC

    1.    First Admission

On the morning of December 31, Bella experienced a five-to-six second syncopal episode. This prompted Kamani to call several veterinary facilities. Kamani called VRCCO first, who recommended Kamani look for an emergency and specialty veterinarian. Kamani called a veterinarian in Gig Harbor, but did not go there because they did not have oxygen. Kamani then looked up "'emergency and specialty care'" online and found AESC. CP at 349. When Kamani looked up AESC and saw they offered oxygen and echocardiograms, she decided to drive to AESC.

Kamani drove about 45-minutes to an hour to AESC. When Kamani took Bella to AESC, she provided employees with Bella's medical records.

Bella was admitted to AESC and was charted to present with respiratory distress. Stone reviewed Bella's medical history and charted a history of pulmonary hypertension and syncopal episodes. Stone also noted a heart murmur and noted that Bella was anxious. Bella was unable to settle, was hyperactive, and appeared anxious. Stone recommended that Kamani continue with Bella's medication for congestive heart failure and to follow up with cardiology as planned. Stone also informed Kamani that putting a pacemaker in Bella could address Bella's syncopal episodes. No cardiologist had ever informed Kamani of this, and Kamani intended to bring it up at the next cardiology appointment. Kamani also recalled Stone told her that they did not have sildenafil—the medication used to treat Bella's pulmonary hypertension and syncope—on site. After the exam, Stone discharged Bella, and Kamani recalled Stone stating that Bella was fit to go home.

5

Kamani stayed in the AESC parking lot for a while after Bella was discharged to make sure Bella was fine. As Kamani began driving home, Bella began hyperventilating—which Kamani describes as "fish mouth breathing." CP at 352. Kamani returned to AESC.

2.      Second Admission

Kamani returned to AESC with Bella around 11:25 a.m.; Bella presented with respiratory distress. AESC admitted Bella, sedated her, and treated her with oxygen.

Stone noted that while Bella was anxious in the kennel, she appeared "nice and pink." CP at 201. Stone recommended weaning Bella from oxygen and sedating her as needed.

According to Stone, if Bella appeared stable on room air, Bella could be discharged.[8] Kamani requested Stone to go back and check Bella, and that if Bella was fine, Kamani would take her. Stone went to check on Bella. After several minutes, Kamani recalled an AESC staff member bringing Bella out. Bella was discharged a second time. After the second discharge, Bella "was wobbling and shaking," so Kamani decided to go back into AESC. CP at 354.

3.      Third Admission

At some point, between the second and third admission, Ojus Mehta, Kamani's ex-husband, showed up at AESC to meet Kamani.

Kamani recalled that during the third admission, Stone was willing to keep Bella on oxygen for a couple hours. Also, Stone gave Bella midazolam to calm her down.

Kamani recounted having a discussion with Susan Hillard, an AESC employee, about sildenafil. At Hillard's request, Kamani handed the sildenafil to Hillard who took the bottle to the

---

[8] The medical records show that these discussions and observations occurred on December 31, but were not entered into Bella's medical records until January 1.

back. At some point, Hillard approached Kamani and asked Kamani about sildenafil doses. During this conversation, Kamani recalled Hillard informing her that Stone would allow her to see Bella.

Hillard brought Kamani to the ICU to see Bella. While there, Kamani was allowed to administer the sildenafil to Bella.

After the ICU encounter, Kamani discussed admitting Bella for 12-hours with Jason Descombaz, a veterinary technician at AESC. Then, Kamani changed her mind and requested that Bella's admission be changed from 12- to 24-hours.

During this interaction, Descombaz asked Kamani to sign a form on a tablet, and Kamani signed the form without reading it. Apparently, this form was the "Admission Summary" which showed an option for 24-hour admission. CP at 509. Also, during this interaction, Kamani gave a Shiva statue[9] (Shivling) to Descombaz to put with Bella.

After signing on the tablet, Kamani asked Descombaz to confirm that the 24-hour option was what she signed for and that signature was there. Descombaz stated, "'I've checked. It is 24-hours and your signature is there now.'" CP at 358. Kamani then paid for the admission. Kamani requested that Descombaz follow up with Stone about Bella's recent diagnostic testing to confirm what additional tests were needed. Kamani recounted there were no discussions about diagnostic testing after that.

---

[9] The Shiva statue, or Shivling, is religious statue.

During Bella's third admission, Stone noted that Bella appeared stable, pink, and anxious. Stone also noted that Bella was placed in an oxygenated kennel, and that he discussed readmitting Bella with Kamani, as well as potential diagnostics that AESC could run.

Stone charted serial discussions with Kamani about the option to hospitalize with support and diagnostics as needed. Stone also noted that Kamani declined to admit Bella overnight and agreed to a shorter block of time. Stone recommended an overnight stay to observe Bella, but Kamani declined. According to Stone, if an owner elects to take a pet home, that he—and AESC staff—have to follow the owner's request.

In an e-mail by Stone to an AESC employee on January 3, 2023 labeled "Addendum," Stone stated that Kamani asked to administer the sildenafil herself. CP at 339. Stone opined that Kamani did not properly administer the sildenafil, and that "[t]his lack of compliance likely . . . had a negative impact on Bella." CP at 339.

4.      Discharge

AESC chart notes stated that Bella was successfully weaned to room air, that Bella began to settle, and that Bella's respiration rate was less frantic. According to AESC staff, Bella had improved since Bella's third presentation. While Bella was still panting, her tongue color had improved and was "more pink." CP at 313. At the time of the third discharge, Bella's respiration was a little increased but not alarming or troublesome.

According to Stone, there "[was] always a risk" Bella would pass after discharge that night. CP at 217. Despite this, at the time, he still expected Bella to be fine at discharge. Stone recalled that Bella had improved, calmed down, and was pink when she left. Moreover, while Bella was

8

still anxious, Bella was comfortable. Also, while Bella had multiple comorbidities, Stone believed Bella's comorbidities were stable.

Stone entered a discharge summary note stating Bella was in an oxygen-rich environment for a few hours, was treated with light sedation, and weaned off oxygen supplementation. He also noted that Bella would be sleepy. Additionally, Stone noted a discussion prior to discharge where Kamani understood that Bella was free to return at any time.

Kamani recalled being told that AESC was weaning Bella from oxygen, and that Bella was doing great and ready for discharge. Kamani recounted being happy.

At discharge, Kamani recalled having a conversation with Stone in the parking lot and generally recalled Stone stating he did not want to keep sedating Bella and her going into syncope. Kamani also recalled Stone asking Kamani when the cardiologist appointment was and Kamani confirmed it was on January 10, 2023. Kamani recounted Stone putting Bella in the car and stating, "[S]he's doing so much better now." CP at 359. She also recounted Stone informing her, "[I]t's 50/50," "you know what's going to happen." CP at 360.

While outside, Kamani recalled Bella appeared to be gasping and that Bella's face was grey. Kamani asked if Bella was fine and recounted being told yes. Kamani remembered that Stone said Bella was stable for discharge.

During the drive home, Mehta sat in the backseat and could not recall hearing Bella hyperventilate. Mehta stated that if there had been something wrong, Kamani would have stopped and made a U-turn.

9

5. Bella's Death

When Kamani, Mehta, and Bella arrived home, Bella began hyperventilating. Mehta stated that it appeared as if Bella was gasping and suffocating for air. Kamani and Mehta turned on a fan and grabbed water for Bella, thinking it would calm Bella down. Mehta recounted turning on a fan, and getting chicken and water for Bella. He also recounted Kamani giving Bella something— maybe Benadryl.

Mehta further recalled that Kamani called Bella's primary care veterinarian[10] and administered CPR. However, about an hour and a half after being discharged from AESC, Bella passed away at home.

C. POST-DEATH EVENTS

1. Police Involvement

After Bella passed, Kamani called AESC. A receptionist answered the phone and recounted the interaction as follows:

> I received another call that caller id listed as "anonymous." After I greeted the female caller, she yelled "I'm going to kill your (profanity) medical director." She continued that Dr. Stone had sent her pet home and she had died. She stated she would report him to the AVMA. The caller was a bit hard to understand as she explained that we should have kept him [sic] on oxygen and they (the owners) would have been happy to stay longer. She said the pet was distressed at home and started "gasping and gasping and gasping," and then passed. She proceeded to use many expletives and abrasive language. She then demanded to speak to Dr. Stone. Up to this point I had been unable to say anything. I informed her that Dr. Stone had gone home for the day and would not be able to speak with her. She hung up.

CP at 226.

---

[10] The primary care veterinarian is in Baltimore, Maryland and not affiliated with AESC or Stone.

The receptionist subsequently called the police and reported the death threat. Police then called Kamani, who asked that police to stop calling her because they were going through a tough time.

When Stone was alerted to Kamani's threat, he was not worried and did not seem to take the threat too seriously because Kamani was probably just venting. Stone declined to press charges.

Kamani denied threatening to kill Stone.

Kamani sent AESC several e-mails between January 3 and January 7, 2023. An e-mail on January 6 stated that Stone harmed a creature of God and promised Stone will be brought to justice. On January 7, AESC became concerned for AESC staff's safety after receiving several of Kamani's e-mails.

AESC subsequently trespassed Kamani from the clinic.

Around the same time, Kamani e-mailed the Poulsbo police "ask[ing] for a harassment complaint against the animal clinic for making false claims to the police." CP at 410. Police found that this claim was unfounded.

Kamani also requested that AESC staff be trespassed from her home. However, the police had not received "any reports of any [AESC] staff trying to contact [Kamani] in person at her home or any other way other than email." CP at 410.

On January 10, AESC sent Kamani a cease and desist letter.

2.      Bella's Medical Records

On December 31, 2022, at 11:34 p.m., Kamani e-mailed AESC requesting records for Bella's treatment.

11

AESC staff first attempted to send Bella's medical records to Kamani by e-mail on January 2, 2023. However, it was sent to the wrong e-mail address due to a typographical error.

Then, AESC sent and Kamani received the requested records on January 3. On the same day that Kamani received the records, Kamani immediately pointed out several perceived inaccuracies about what was relayed and what was written. Kamani continued to send e-mails to AESC asking questions and requesting information about how Bella was treated.

Kamani also e-mailed her primary care veterinarian, who reviewed Bella's records from AESC. The primary care veterinarian opined that Bella could have had an acute respiratory system collapse due to the constant stress on her system from the pulmonary hypertension. He also stated that Bella's death could happen in spite of the correct symptomatic and appropriate treatments.

D.    PROCEDURAL HISTORY

1.    Lawsuit

Kamani filed suit against Stone and AESC on March 30, 2023. Kamani sued Stone for outrage, fraud, and negligence. Kamani sued AESC for outrage, fraud, breach of veterinary services contract, and professional negligence. Kamani sought noneconomic and economic related damages.

Stone and AESC filed an answer on May 8. Stone and AESC pleaded the following affirmative defenses: (1) that the alleged injuries and damages may have resulted from Kamani's comparative negligence or failure to mitigate; (2) that intervening or superseding events caused Bella's alleged injuries and damages; and (3) that Bella's alleged injuries and damages may have resulted from pre-existing injuries, physical conditions, or psychological conditions unrelated to Kamani's claims against Stone and AESC.

An audit trail of the medical chart notes conducted during discovery shows that there were some entries on December 31, 2022 that were edited and that there were later entries inputted into the system on January 1 and 2, 2023, and backdated to December 31.[11] Since AESC staff sees multiple patients in a day, it is common for AESC staff to write up medical records the next day. It is also common for staff to remember something and during the next shift add the missing information.

### 2. Motion for Summary Judgment

Stone and AESC moved for summary judgment. They requested that the trial court dismiss (1) the negligence claims because Bella's cause of death was unknown and expert testimony failed to establish each element of the claim, (2) the outrage claims because Kamani failed to state a cause of action, (3) the fraud claims because such a claim is not recognized in veterinary medicine and Kamani could not meet her burden of proof as to each element, (4) the breach of contract claim because Kamani's suit is barred by the exculpatory clause in the contract and because such a claim

---

[11] Kamani submitted a twelve-page appendix document with her appeal. Appendix A appears to be snipped and expanded versions spotlighting sections of the seven-page audit trail per RAP 10.4(c). Appendix B appears to be a legible copy of a section of the records that Stone and AESC submitted with their motion for summary judgment.

In the record, Kamani submitted a seven-page audit trail of AESC's records, as Exhibit H, in her response to Stone/AESC's motion for summary judgment. That document is illegible. Kamani resubmits this same seven-page document in her motion for reconsideration. This document, while it has some legible words, for the most part it is illegible.

The section of the records that Stone and AESC submitted with their motion for summary judgment has illegible highlighted entries.

Since the parties do not appear to dispute the content of the entries, and only dispute what should be inferred from the entries, we will refer to Appendix A and Appendix B for legibility.

is duplicative of the veterinary negligence claim, and (5) any other implied causes of action that were not pled.

Kamani opposed the motion for summary judgment in its entirety. Kamani supported her opposition with the declaration of Danielle Babski, DVM. Babski provided several possibilities for Bella's death. A few examples being: failing to offer or perform chest radiographs; failing to provide, at a minimum, overnight hospitalization with supplemental oxygen and continued administration of previously prescribed medications; failing to consider referral to a more equipped and capable specialty hospital; discharging Bella three times; failing to actually treat the presumed anxiety; and abandoning and neglecting Bella. Babski concluded that these possibilities proximately resulted in Bella's death.

Kamani later filed a second declaration by Babksi. In that declaration, Babski stated she is unable to provide a more precise cause of the condition ailing Bella on December 31, 2022. Babski then listed several potential conditions and provided further discussion about the various possibilities for Bella's death.

On April 3, 2024, the trial court partially granted the motion for summary judgment. Specifically, the trial court dismissed all claims against Stone and AESC except for the negligence claims. The trial court's order also stated that having dismissed the outrage and fraud claims, Kamani could not recover noneconomic emotional distress damages or wage loss damages.

Kamani filed a motion for reconsideration. The trial court denied Kamani's motion for reconsideration on April 22.

Kamani moved for the trial court to certify the partial summary judgment order and order denying reconsideration as final under CR 54(b). The trial court granted the motion.

Kamani appeals based on the trial court's CR 54(b) certification.

ANALYSIS

Kamani argues that the trial court erred when it granted Stone and AESC's motion for summary judgment and dismissed Kamani's outrage, fraud, and breach of contract claims against Stone and AESC. Kamani also argues that because the trial court erred in dismissing the outrage and fraud claims, the trial court erred when it prohibited Kamani from recovering noneconomic or emotional distress damages, or wage loss. Lastly, Kamani alleges that the trial court erred when it denied Kamani's motion for reconsideration. We address each claim in turn.

A.    SUMMARY JUDGEMENT

We review a trial court's order on summary judgment de novo. *Spohn v. Dep't of Lab. & Indus.*, 20 Wn. App. 2d 373, 378, 499 P.3d 989 (2021). Summary judgment is appropriate if, when viewing the facts in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 226, 770 P.2d 182 (1989); CR 56(c). Genuine issues of material fact exist when reasonable minds could reach different conclusions as to the fact at issue. *Michael v. Mosquera-Lacy*, 165 Wn.2d 595, 601, 200 P.3d 695 (2009).

When the moving party meets the initial burden of showing absence of an issue of material fact, then the burden shifts to the nonmoving party to make a showing sufficient to establish the existence of an essential element of the case. *Young*, 112 Wn.2d at 225-26. The purpose of summary judgment is to avoid unnecessary trials where insufficient evidence exists. *Pelton v. Tri-State Mem'l Hosp., Inc.*, 66 Wn. App. 350, 355, 831 P.2d 1147 (1992).

Although we review the evidence in the light most favorable to the nonmoving party, mere allegations or conclusory statements of fact, unsupported by evidence, are not sufficient to create a genuine issue of material fact. *Discover Bank v. Bridges*, 154 Wn. App. 722, 727, 226 P.3d 191 (2010). The nonmoving party "'may not rely on speculation, argumentative assertions that unresolved factual issues remain, or in having its affidavits considered at face value.'" *Id.* (quoting *Seven Gables Corp. v. MGM/UA Ent. Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986)). "[A] party's declaration is enough to create a question of fact where [the plaintiff's] deposition testimony was based on [their] personal observations of the defendant's conduct." *Reagan v. Newton*, 7 Wn. App. 2d 781, 806, 436 P.3d 411 (2019), *review denied,* 193 Wn.2d 1030 (2019).

B.     OUTRAGE[12]

Kamani argues that Stone's acts and omissions on December 31, and the days after, were outrageous and caused her extreme emotional harm. Specifically, Kamani alleges that Stone acted outrageously when Stone (1) misdiagnosed Bella, (2) withheld treatment, (3) improperly backdated clinical notes in Bella's medical records after Bella died, and (4) weaned Bella from oxygen and discharged Bella contrary to Kamani's wishes and knowing that Bella would pass shortly thereafter. We disagree.

1.     Legal Principles

To prevail on a claim of outrage, the plaintiff must produce evidence showing (1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) that

---

[12] The tort of outrage is synonymous with a claim for intentional infliction of emotional distress. *Repin v. State*, 198 Wn. App. 243, 265, 392 P.3d 1174, *review denied*, 188 Wn.2d 1023 (2017).

plaintiff actually suffered severe emotional distress. *Lyons v. U.S. Bank Nat'l Ass'n.*, 181 Wn.2d 775, 792, 336 P.3d 1142 (2014).

Extreme and outrageous conduct is that which is "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Grange Ins. Ass'n v. Roberts*, 179 Wn. App. 739, 754, 320 P.3d 77 (2013) (internal quotation marks omitted) (quoting *Reid v. Pierce County*, 136 Wn.2d 195, 202, 961 P.2d 333 (1998)), *review denied*, 180 Wn.2d 1026 (2014). Such conduct must be so extreme and outrageous that its recitation to "'an average member of the community would arouse . . . resentment against the actor'" and cause the listener to exclaim "'Outrageous!'" *Kloepfel v. Bokor*, 149 Wn.2d 192, 196, 66 P.3d 630 (2003) (internal quotation marks omitted) (quoting *Reid*, 136 Wn.2d at 201-02).

While generally an outrage claim presents questions of fact, Washington courts "consider[] themselves gatekeepers for purposes of allowing a jury to decide" an outrage claim. *Repin v. State*, 198 Wn. App. 243, 266, 392 P.3d 1174 (2017), *review denied*, 188 Wn.2d 1023 (2017); *see also*, *Lyons*, 181 Wn.2d at 792. Thus, on summary judgment, a trial court must initially determine whether the alleged conduct may "reasonably be regarded as so extreme and outrageous as to warrant a factual determination by the jury." *Repin*, 198 Wn. App. at 266. The level of outrageousness required is extremely high and is not an easy requirement to meet. *Id.* at 267; *Christian v. Tohmeh*, 191 Wn. App. 709, 736, 366 P.3d 16 (2015), *review denied*, 185 Wn.2d 1035 (2016).

When reviewing conduct to determine if it is sufficient to support an outrage claim, courts may consider a number of factors:

(1) the position the defendant occupied, (2) whether the plaintiff was particularly susceptible to emotional distress and the defendant was aware of the susceptibility, (3) whether the defendant's conduct was privileged, (4) whether the degree of emotional distress was severe as opposed to merely annoying, inconvenient or embarrassing, and (5) whether the defendant was aware of a high probability that his or her conduct would cause severe emotional distress, and consciously disregarded that probability.

*Sutton v. Tacoma Sch. Dist. No. 10*, 180 Wn. App 859, 870, 324 P.3d 763 (2014).

### 2. Outrage Claims Against Stone

For the outrage claims against Stone, Kamani was required to show that Stone's actions were so extreme and outrageous that Kamani suffered severe emotional distress, and that Stone intentionally or recklessly, rather than negligently, brought about that distress. *Womack v. Von Rardon*, 133 Wn. App. 254, 261, 135 P.3d 542 (2006).

#### a. Stone's Conduct Not Outrageous

As a preliminary matter, we acknowledge Stone's position in relation to Kamani. Stone is a licensed veterinarian with the Washington Department of Health and has worked in the profession for over 24 years. A veterinarian's practice must be conducted on the highest plane of honesty, integrity, and fair dealing. WAC 246-933-080. Thus, Stone was in a position where it was reasonable for Kamani to entrust the care of Bella to Stone. However, even in this context and even when the evidence is viewed in a light most favorable to Kamani, Kamani's outrage claims fail.

Kamani claims a plethora of alleged outrageous acts and omissions by Stone which can be put into three categories, and each category will be addressed in turn.

18

> i.      Misdiagnosis of Bella

Kamani argues that Stone's conduct was outrageous when he misdiagnosed Bella and relayed different diagnoses to various individuals. Kamani contends that Stone misdiagnosed Bella when Stone claimed Bella was anxious, said Bella needed a pacemaker, and said after Bella's death that Kamani's improper administering of medication to Bella while Bella was hospitalized "was to Bella's detriment." Br. of Appellant at 54.

A "diagnosis" is the "act of identifying a disease from its signs and symptoms." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 622. While the record shows Stone stated Bella was anxious, there is no record that Stone diagnosed Bella with anxiety. The record also shows that Stone charted in the "Neuro" section "anxious," that Bella presented with "respiratory distress," and stated that Bella was anxious in the oxygenated kennel. CP at 197, 199. The record further shows that Stone charted a medical history of "pulmonary hypertension, known hx of syncope, heart murmur, suspected chronic upper airway disease, likely blind, marked dental disease, and marked anxiety." Br. of Appellant, App. A[13] at 6. And the record shows that Stone discussed with Kamani about medication that could calm Bella down and treated Bella with that medication. The record also shows that Stone discussed the possibility of a pacemaker surgery with Kamani. Kamani's claims of misdiagnoses are not supported by the record. In fact, there is

---

[13] Kamani submitted Appendix A with her opening brief, which appears to be snipped and expanded entries spotlighting sections of a seven-page audit trail per RAP 10.4(c). Kamani also submitted a seven-page audit trail of AESC's records, as Exhibit H, in her response to Stone/AESC's motion for summary judgment. Exhibit H is illegible. Kamani resubmitted this same seven-page document in her motion for reconsideration. This document, while it has some legible words, for the most part also is illegible. Because the parties do not appear to dispute the time or content of the entries, only what should be inferred from the entries, we will refer to Appendix A of Kamani's opening brief due to its legibility.

no evidence that Stone made any diagnoses. To the extent Stone did make a diagnosis, a misdiagnosis is not outrageous conduct, especially in the context of Bella's medical history.

Kamani also argues it was outrageous that Stone relayed different diagnoses to various AESC individuals. As discussed above, the record does not show that Stone made any diagnoses. Moreover, even if Stone had relayed different diagnoses to various individuals as Kamani claims, Kamani does not explain how sharing Bella's presentation of alleged diagnoses with AESC staff, even if they were different than what was relayed to Kamani, was extreme and outrageous conduct.

Kamani further argues that Stone misdiagnosed Bella by blaming Kamani for Bella's death. However, Stone's e-mail after Bella's death about improper administration of sildenafil is not a diagnosis. To the extent this is a diagnosis, Stone did not state that the improper administration of medication caused Bella's death. Rather, Stone stated that improper administration of the medication "likely . . . had a negative impact on Bella." CP at 411. Indicating something likely had a negative impact is not a diagnosis. And even if it was, such a misdiagnosis is not extreme and outrageous conduct.

Moreover, the record does not provide a cause of death for Bella; rather, the record only provides several possibilities for a cause of death. The record also shows that Bella's primary veterinarian believed Bella would have died anyway. Given the record, and without a definitive cause of death, it is speculative to claim that Stone's misdiagnosis was so extreme or outrageous that it caused Bella's death, which led to Kamani's emotional distress.

In sum, the record does not show Stone misdiagnosed Bella, and even if he did, such conduct, in the context of the record, cannot be considered extreme or outrageous as a matter of law.

20

ii.     Withholding treatment

Kamani argues that Stone's conduct was outrageous when Stone withheld treatment by removing Bella from oxygen, failing to treat Bella's anxiety, failing to house Bella in a room with an oxygen tank, and failing to provide treatment for each of his purported diagnoses. Kamani also argues that Stone abandoned Bella per WAC 246-933-060 when he discharged Bella.

Once a veterinarian accepts an animal for treatment, "the veterinarian shall not neglect the patient, as long as the person presenting the patient requests and authorizes the veterinarian's services for the particular problem." WAC 246-933-060. Here, there is no evidence supporting Kamani's claim that Stone withheld treatment from or abandoned Bella.

Instead, the undisputed record shows that Stone treated Bella each time Bella was admitted. The record also shows that Kamani authorized Bella's final discharge, that Kamani was "happy" when Bella was removed from oxygen, and Kamani accepted Bella at discharge. CP at 359. While Kamani claimed in her deposition that she did not authorize the discharge, her agreement or disagreement with Bella's discharge fails to create a genuine issue of material fact as to whether Stone abandoned Bella or withheld treatment. There is no evidence to show that Bella medically required oxygen at the time she was removed from oxygen, what treatment Bella required for anxiety that Stone refused to give, or that keeping Bella in a room with an oxygen tank was a required treatment that Stone withheld. Also, Kamani fails to identify what treatment was required for each purported diagnosis she alleges Stone withheld. Thus, Kamani's outrage claim that Stone failed to treat or abandoned Bella fails as a matter of law.

Kamani also appears to argue that Stone's withholding of information regarding AESC's lack of specialty services was outrageous. However, regardless of any representations Stone may

21

have made to Kamani about specialty services available or not available at AESC, such conduct, in light of the record before us, is not outrageous as a matter of law.

### iii. Routine medical record edits

Kamani argues that Stone's conduct was outrageous when Stone added notes to Bella's chart on January 1, then backdating them to December 31, and when Stone revised Stone's December 31 notes. Kamani asserts that this manipulation of the record shows an elaborate, timepoint-curated, contradictory attempt to blame Kamani for Bella's death. However, the record shows that this practice of piecemeal notations is common.

The undisputed evidence in the record shows that it is common for AESC staff to write up some medical records on the day of services and then write up the rest of their medical records the next day. Thus, Stone's adding to and revising of medical notes the day after he provided emergency treatment to Bella does not make an average member of the community resent Stone and exclaim "'Outrageous!'" *Kloepfel*, 149 Wn.2d at 196 (internal quotation marks omitted) (quoting *Reid*, 136 Wn.2d at 202). This claim fails as a matter of law.

### b. Kamani's susceptibility to emotional distress

Kamani also argues that because Stone knew she was highly susceptible to severe emotional distress, his actions were extreme and outrageous. We disagree.

There is no evidence in the record that Stone was aware Kamani was highly susceptible to severe emotional distress. And there is no evidence that Stone had met or had any experiences with Kamani prior to the day he provided emergency services to Bella, or that Stone was told Kamani was highly susceptible to emotional distress.

Moreover, Kamani fails to demonstrate she was any more susceptible to emotional distress than any other pet owner who seeks emergency veterinary care. There is evidence in the record that while Kamani was visibly upset and emotional at the clinic, "a lot of people are emotional and concerned when they come to the emergency with their pets." CP at 304. Thus. Kamani fails to show, let alone create a genuine issue of material fact, that Stone knew Kamani was highly susceptible to emotional distress. This claim fails as a matter of law.

            c.        Intent element absent

Kamani argues that when Stone misdiagnosed Bella, failed to treat Bella, and discharged Bella, he did so with the intent to cause Kamani severe emotional distress. However, Kamani fails to create a genuine issue of material fact showing Stone had the requisite intent to cause Kamani severe emotional distress.

There is no evidence in the record showing that Stone intended for Bella to die based on his treatment or that Stone intended to cause Kamani emotional distress. Even in a case where the facts are shocking, if intent is not established, the outrage claim fails. *See Womack*, 133 Wn. App. at 261 ("What [defendants did to plaintiff's cat] was deplorable, but the record does not sufficiently establish the required intent or the necessary severity.").

Kamani asserts that in *Womack*, the court found a lack of intent because the defendants did not know the plaintiff. That reasoning applies here as well because Stone did not know Kamani. The undisputed record shows that it was Kamani's first time at AESC and her first time meeting Stone; thus, it would be a stretch to argue that Stone knew Kamani or that Stone knew Kamani was susceptible to emotional distress. Like in *Womack*, there is no evidence of the requisite intent for an outrage claim. Therefore, Kamani's outrage claims against Stone fail as a matter of law.

23

3.  Outrage Claims against AESC

a.  AESC's conduct not outrageous

Kamani argues that AESC's acts and omissions on December 31, and the days after, were extreme and outrageous and caused her severe emotional harm.  Specifically, Kamani alleges that AESC acted outrageously when AESC staff (1) failed to monitor Bella, (2) delayed the transmission of Bella's records to Kamani, and (3) contacted the police and sent Kamani a cease and desist letter.[14]

We affirm the trial court's dismissal of Kamani's outrage claim against AESC because even when the evidence is viewed in a light most favorable to Kamani, the record does not raise a genuine issue of material fact as to whether AESC's conduct was extreme and outrageous, or whether AESC intended to cause Kamani severe emotional distress.

i.  Notes indicating limited monitoring

Kamani argues that AESC intentionally inflicted emotional distress when they stopped monitoring Bella's vitals and heartrate after 5:00 p.m. and continued weaning Bella from oxygen despite Bella's elevated heart rate.  However, the record is devoid of any evidence that AESC, even if they did stop monitoring Bella and weaned Bella from oxygen, did so with the intent to inflict emotional distress on Kamani.  This claim fails as a matter of law.

---

[14]  Kamani also argues that Stone's alleged conduct imputes to AESC because he was the medical director and had an executive role in AESC's alleged outrage.  However, since Stone's acts and omissions are not outrageous, we need not evaluate this alleged theory of vicarious liability on AESC.

ii. Delayed records

Kamani argues AESC acted outrageously when it delayed sending Bella's records to Kamani. We disagree.

Here, AESC initially sent the records to the wrong e-mail because of a typographical error. But even considering this delay, Kamani received Bella's records well within the 10-working days window referenced in WAC 246-933-320(9), which states that an animal's medical records shall be "made available as promptly as required by medical necessity or public health circumstances, but no later than ten working days" after the request is made. Kamani requested Bella's records on December 31, 2022, and received the requested records on January 3, 2023. Thus, Kamani's outrage claim based on AESC's provision of Bella's medical records three days after she requested them fails as a matter of law.

iii. Contacting police and sending cease and desist letter

Kamani argues that AESC's contacting the police was outrageous conduct. We note that in her complaint, Kamani stated that "no part of any claim made pertains to or arises from [AESC], Stone, or any employee of [AESC] communicating with 911, Poulsbo Police Department, or any government agency." CP at 15 n.3. Regardless, we disagree with Kamani.

The record shows AESC called the police after Kamani called AESC and threatened to kill Stone. AESC then trespassed Kamani from the clinic on or around January 7 and sent her a cease and desist letter on January 10, after Kamani sent seven e-mails between January 3 and January 7 to AESC, which prompted concerns for the safety of AESC staff. In Kamani's e-mail to AESC on January 6, she stated that "[w]e have made multiple requests via email, phone, and in person to get information about how you treated our dog." CP at 178. In that same e-mail, Kamani

"promise[d]" that Stone would be brought to justice for harming a "creature of God," that "God is watching," that Stone was "evil" and "got away with murder." CP at 178. In two of Kamani's e-mails, Kamani mentioned phone calls to AESC. In Kamani's January 7 e-mail, she documented that Mehta visited AESC.

Kamani cites to *Burgess v. Taylor*, 44 S.W.3d 806 (Ky. App. 2001), to support her argument that outrage should be found here because despite AESC's knowledge of Bella's death, AESC still contacted the police, trespassed Kamani, and sent a cease and desist letter. In *Burgess*, a court in Kentucky found outrage viable where a distraught and frightened plaintiff begged the defendant to find out where their horses were to save them from being sent to a known slaughter-buyer. *Id.* at 811-12.

Here, unlike the plaintiff in *Burgess*, Kamani was not merely seeking information about her pet; instead, the undisputed evidence shows that Kamani's contacts with AESC staff left them concerned for their safety. We are not bound by another jurisdiction's case law, and we decline to follow *Burgess*. Instead, we hold that Kamani's outrage claims based on AESC calling the police, trespassing Kamani from AESC, and sending Kamani a cease and desist letter fail as a matter of law.

b.      Kamani's susceptibility to emotional distress

Kamani argues that Stone's knowledge of her susceptibility to emotional distress should be attributed to AESC. Kamani asserts that because she was particularly vulnerable to emotional distress, and AESC knew as much, AESC's actions were particularly extreme and outrageous. *Sutton*, 180 Wn. App. at 870. However, as discussed above, there is no evidence that Stone had any knowledge of Kamani's susceptibility to emotional distress. Also, there is no evidence to

show that AESC had any knowledge that Kamani was particularly susceptible to emotional distress.

Kamani argues that showing up three times in a day, giving a Shivling statue to AESC staff for Bella, and seeking video updates of Bella from staff should have informed AESC of Kamani's particular susceptibility to emotional distress. However, while these acts show Kamani's deep love for Bella, they do not show that Kamani was particularly susceptible to emotional distress. Kamani's outrage claim based on AESC's alleged knowledge of her susceptibility to emotional distress fails as a matter of law.

c.    AESC's intent

Kamani argues that AESC acted with knowledge of Bella's inevitable death and acted with the intent to inflict emotional distress onto Kamani. However, the record is devoid of any evidence showing such knowledge and intent.

There is no evidence in the record that shows AESC knew Bella would die an hour and a half after discharge or that AESC intended to cause Kamani severe emotional distress. Kamani admitted that she does not know whether AESC staff believed Bella would die 90-minutes after discharge. Thus, even when the evidence is viewed in the light most favorable to Kamani, there is no evidence that AESC knew Bella would die an hour and a half after discharge or that AESC acted with intent to inflict emotion distress onto Kamani. AESC's conduct was not outrageous as a matter of law, and we affirm the trial court's dismissal of Kamani's outrage claim against AESC.

Kamani fails to create a genuine issue of material fact as to whether Stone and AESC's actions were extreme and outrageous, or whether Stone and AESC intentionally caused Kamani emotional distress. Therefore, we hold that Kamani's outrage claims fail as a matter of law and

27

affirm the trial court's summary judgment dismissal of Kamani's outrage claims against Stone and AESC.[15]

C.    FRAUD

Kamani argues that all of the facts, taken together as a whole, support her argument of fraud.[16]    Kamani contends that Stone conveyed untruthful material information and expected Kamani to rely on this information. We disagree.

1.    Legal Principles

The nine elements of fraud are: (1) representation of an existing fact, (2) materiality, (3) falsity, (4) the speaker's knowledge of the fact's falsity, (5) intent of the speaker that it should be acted upon by the plaintiff, (6) plaintiff's ignorance of its falsity, (7) plaintiff's reliance on the truth of the representation, (8) plaintiff's right to rely upon it, and (9) damages suffered by the plaintiff. *Stiley v. Block*, 130 Wn.2d 486, 505, 925 P.2d 194 (1996). Each element of fraud must be established by clear, cogent, and convincing evidence. *Id*. Clear, cogent, and convincing evidence exists when the ultimate fact at issue is highly probable and is supported by substantial evidence. *In re Dependency of K.S.C.*, 137 Wn.2d 918, 925, 976 P.2d 113 (1999); *In re Det.of B.M.*, 7 Wn. App. 2d 70, 85, 432 P.3d 459, *review denied*, 193 Wn.2d 1017 (2019). Lastly, when a duty to disclose exists, the suppression of a material fact is tantamount to an affirmative

---

[15] Accordingly, Kamani is not entitled to any related noneconomic or economic damages recoverable for the tort of outrage.

[16] Kamani argues that fraud is seldom proved by direct evidence, and that the circumstances here, taken as a whole, has potent persuasive force. Kamani also argues that circumstantial evidence provides the brick and mortar of a fraud claim. But Kamani fails to cite to any authority or case law to support her arguments. RAP 10.3(a)(6) requires that all arguments be made with citations to legal authority. Kamani did not do so.

representation. *Alexander v. Sanford*, 181 Wn. App. 135, 177, 325 P.3d 341 (2014), *review granted*, 181 Wn.2d 1022 (2014), *appeal dismissed per stipulation* (May 8, 2015).

2.      Fraud Claims Against Stone

Kamani alleges Stone engaged in various acts and omissions that constituted fraud. The various alleged acts and omissions can be categorized into several categories: (1) that Stone's misdiagnoses, or purported diagnoses, were fraud, (2) that Stone withheld key information about Bella's health and withheld information about services offered by AESC, (3) that Stone made additional notes and edited Bella's records after December 31.

a.      Misdiagnoses

Kamani appears to argue that Stone committed fraud when Stone relayed different diagnoses to different individuals, demonstrating that Stone himself doubted whether "Bella's symptoms were anxiety-driven." Br. of Appellant at 54. Kamani appears to contend that it was a fraudulent misrepresentation when Stone portrayed anxiety symptoms to Kamani while portraying the need for pacemaker surgery for Bella's syncope to an AESC staff member, but then portrayed to the police that Kamani improperly administered sildenafil to Bella's detriment. Specifically, Kamani argues Stone "lied, stating it was anxiety, while not treating anxiety, and verbalizing to othersr [sic] concerns he believed ailed her, thus proving his inherent belief that Bella's symptoms were *not* a result of anxiety." Br. of Appellant at 79 (emphasis in original).

Kamani bears the burden on summary judgment to present clear, cogent, and convincing evidence that creates a genuine issue of material fact that Stone committed fraud when he relayed to Kamani that Bella was anxious, but conveyed to AESC staff that a pacemaker could address Bella's syncopal episodes. Kamani fails in her burden because the record is devoid of any evidence

that Stone's statements were false, that he knew his statements were false, or that he fraudulently conveyed something different to AESC staff.

The undisputed record shows that Stone noted Bella was anxious and treated Bella's anxiety. The undisputed record also shows that Stone recommended a pacemaker to address Bella's syncope and that Stone discussed with Kamani the possibility of a pacemaker surgery for Bella's syncope. There is nothing in the record that shows Stone's statements were false, that Stone knew they were false, or that Stone conveyed something different to AESC staff. Kamani's fraud claim fails as a matter of law.

b.      Stone did not withhold information from Kamani

Kamani argues it was fraud for Stone to not inform her that AESC lacked sildenafil and specialty services. Additionally, Kamani argues it was fraud when Stone withheld information about Bella's health, stating it was anxiety, when Stone believed something else ailed Bella. Kamani contends Stone stood firm to the false view that the sooner Bella was home, the better.

With regard to Kamani's claim of fraud based on not relaying information to her about not having medication on site, Kamani contends that Stone withheld AESC's lack of sildenafil. However, the record shows that Kamani admitted Stone informed her that AESC did not have any sildenafil. Kamani's fraud claim fails as a matter of law.

With regard to Kamani's claim that Stone committed fraud by not relaying to her the lack of specialty services offered by AESC, Kamani asserts that Stone had a duty to disclose that AESC could not provide pacemaker surgery or other specialty services. However, there is nothing in the record that shows Kamani requested a pacemaker surgery or that Stone told Kamani that AESC had the ability to perform the pacemaker surgery. Since there was no request for such surgery by

Kamani nor any representation by Stone that AESC could perform a pacemaker surgery, Kamani's fraud claim fails as a matter of law because Stone did not falsely represent an existing fact.

Also, Kamani failed to create a genuine issue of material fact that Stone believed something else ailed Bella and withheld that information from Kamani. The undisputed evidence shows that Stone believed and represented to Kamani that Bella was anxious, that Bella's comorbidities were stable, and discussed both Bella's anxiety and Bella's comorbidities with Kamani—specifically, the syncope and the recommended pacemaker surgery.

The undisputed evidence in the record also shows that Stone disclosed and treated Bella for both anxiety and Bella's comorbidities. Stone informed Kamani a pacemaker was one way to address the syncope issue and in response, Kamani said she would bring it up at Bella's next cardiologist appointment. Stone informed Kamani that Bella was unable to calm down and discussed medications with Kamani. Upon final discharge, Stone confirmed the cardiologist appointment with Kamani. Stone provided oxygen to Bella and medication to calm Bella down. Each condition that Stone believed ailed Bella, he treated for or addressed with Kamani.

Kamani fails to create a genuine issue of material fact that Stone believed something else ailed Bella. Because there is no evidence in the record that Stone believed something else ailed Bella, Stone could not have falsely represented a material fact, and Kamani's fraud claim against Stone fails as a matter of law.

3. Fraud Claims Against AESC

a. AESC's namesake as a specialty center is not fraud

Kamani argues that AESC committed fraud because it named itself a "'specialty'" center despite not having someone on site to interpret echocardiograms or implant a pacemaker. Br. of Appellant at 81-82.

However, the record is devoid of any evidence showing that having "specialty" in a name requires a veterinarian to employ someone to interpret echocardiograms or implant a pacemaker. Also, there is no evidence that on December 31, Kamani asked for an echocardiogram interpretation or a pacemaker surgery; nor is there any evidence that AESC represented to Kamani that they had someone on site to interpret an echocardiogram and implant a pacemaker. Instead, the undisputed evidence shows that in the discussion of the pacemaker between Stone and Kamani, Kamani stated that she would follow up at Bella's next cardiologist appointment. Furthermore, there is nothing in the record showing that on December 31, Kamani requested an echocardiogram.

Kamani also asserts that AESC committed fraud by failing to inform Kamani that they did not have sildenafil. However, the undisputed record clearly shows that Stone told Kamani that AESC did not have sildenafil. Thus, Kamani fails to show a false representation of an existing fact.

b. AESC did not withhold information from Kamani

Kamani argues that AESC committed fraud when AESC repeatedly disregarded Kamani and Bella and withheld necessary veterinary care for hours by discharging Bella three times, withholding information about Bella's health, and by withholding the fact that AESC did not have a pacemaker surgeon on site.

However, as discussed above, there is no evidence in the record to create a genuine issue of material fact on Kamani's fraud claims. On the contrary, the undisputed record shows that during each admission at AESC, AESC collectively admitted and treated Bella's anxiety and comorbidities, or discussed the same with Kamani. Kamani fails to identity what information was falsely conveyed to her to support her claim that AESC fraudulently disregarded Kamani and Bella, withheld necessary care, or withheld the fact that AESC did not have a pacemaker surgeon on site. Also, with regard to the fraud claim relating to withholding care to Bella, that is a negligence claim, not a fraud claim.

In each category of acts and omission that Kamani alleges were fraudulent, there is no evidence to create a genuine issue of material fact for all the elements of fraud against AESC. As such, the trial court properly dismissed Kamani's fraud claims against AESC.

4.      Stone and AESC's Backdating of Records and Editing Records is not Fraud

Kamani argues that Stone and AESC materially altered Bella's medical records, fabricating conversations and actions that never occurred. However, even if we were to assume that Stone and AESC materially altered Bella's medical records and fabricated conversations and actions that never occurred, Kamani fails to show, or even create a genuine issue of material fact, that she was ignorant of the falsities in the altered medical records or that she relied on the truth of the representations in the backdated or edited records.[17] While Kamani may disagree with what was

---

[17] The undisputed facts in the records show that it is common practice for piecemeal notations because AESC, as an emergency care center, sees multiple patients in a day. AESC staff may not write up medical records on the day of and the staff may write up the rest of their medical records the next day, which explains why pieces of information may be added after the initial visit and why prior notes may have been edited.

recorded in the altered medical records, there is no evidence that Stone and AESC made the alterations with knowledge of its falsity, that Kamani was unaware of the contents of the altered medical records, or that Kamani relied on the altered records. Thus, Kamani's fraud claim fails as a matter of law.

In each claim of fraud against Stone and AESC, Kamani is unable to show a genuine issue of material fact as to all elements of fraud. As such, the trial court properly dismissed all fraud claims.[18]

C.      BREACH OF CONTRACT

Kamani argues the trial court erred by dismissing her breach of contract claim. AESC responds that the trial court did not err because the prohibition on double recovery precludes Kamani from maintaining both a veterinary negligence and a breach of contract claim. We agree with AESC.

1.      Legal Principles

Washington courts have consistently avoided double recovery. *See Lange v. Town of Woodway,* 79 Wn.2d 45, 49, 483 P.2d 116 (1971) (adopting the election of remedies doctrine for "the sole purpose of preventing double redress for a single wrong"); *Rice v. Janovich,* 109 Wn.2d 48, 61–62, 742 P.2d 1230 (1987) (holding that the trial court erred by giving jury instructions for both assault and outrage for the same conduct because it allowed for the possibility of double recovery); *Sherry v. Fin. Indem. Co.,* 160 Wn.2d 611, 621–22, 160 P.3d 31 (2007) (discussing rules designed to prevent double recovery in the context of an underinsured motorist). "It is a

---

[18] As a result, Kamani is not entitled to any alleged noneconomic or economic damages relating to the fraud claims.

basic principle of damages, both tort and contract, that there shall be no double recovery for the same injury." *Eagle Point Condo. Owners Ass'n v. Coy*, 102 Wn. App. 697, 702, 9 P.3d 898 (2000).

The rule of double recovery, known as one satisfaction, is a legal doctrine that establishes there shall be no double recovery for the same injury. *Larson v. Hodge*, 100 Wash. 419, 424, 171 P. 251 (1918); *Eagle Point*, 102 Wn. App. at 702. Furthermore*,* while a plaintiff is entitled to allege their respective theories of recovery alternatively, or in separate claims, they are not entitled to recover twice for damage growing out of the same occurrence or event. *Brink v. Griffith*, 65 Wn.2d 253, 259, 396 P.2d 793 (1964).

On summary judgment, the trial court may either dismiss a case entirely or narrow the issues for trial. CR 56(a), (b); *Babcock v. State*, 116 Wn.2d 596, 599, 809 P.2d 143 (1991).

2.      Breach of Contract Claim Impermissibly Duplicates Negligence Claim

Kamani concedes that her breach of veterinary contract claim duplicates the veterinary negligence claim because "the same evidence supporting her negligence claim also promoted the contact breach claim, since, after all, negligent performance of a service contract causing harm is a material breach thereof." Br. of Appellant at 87-88. The record also shows that in Kamani's opposition to the motion for summary judgment, Kamani asserted that she hired AESC to competently, humanely, and prudently provide veterinary services to Bella. Thus, Kamani improperly seeks to recover damages in tort and in contract for the same actions.

Kamani appears to argue that double recovery is not an excuse to dismiss a cause of action pled in the alternative. But Kamani misinterprets the case law. Generally, Kamani is entitled to allege alternate theories of recovery on separate claims. *Brink*, 65 Wn.2d at 259. Per *Brink*,

however, Kamani is not entitled to recover twice for the same elements of damage growing out of the same occurrence or event. *Brink*, 65 Wn.2d at 259. Thus, because Kamani's contract and negligence claims are premised on the same acts and allegations, she cannot plead them in the alternative, and we affirm the trial court's dismissal of the breach of contract claim.

D.      DENIAL OF MOTION FOR RECONSIDERATION

Kamani assigns error to the trial court's denial of her motion for reconsideration. However, because Kamani does not include any argument as to why the trial court erred in its denial of Kamani's motion to reconsider, she has waived her argument.

RAP 10.3 outlines the requirements for the contents of an appellant's brief, specifically requiring an argument section. RAP 10.3(a)(6). Assignments of error not argued in the brief are deemed to have been abandoned. *Spino v. Dep't of Lab. & Indus.*, 1 Wn. App. 730, 732, 463 P.2d 256 (1969) (court did not consider the assignment of error because the assignment of error was not argued in the brief and was thus abandoned), *review denied*, 77 Wn.2d 962 (1970). Additionally, assignments of error neither supported by argument nor by citation to authority are not properly before this court. *Id.* We do not review errors alleged but not supported with citation to authority. *Repin*, 198 Wn. App. at 269.

Here, Kamani does not provide any argument nor make any citations to authority in support of her argument regarding her motion for reconsideration. Without any arguments, citations to authority, or any indication on how the trial court erred in its decision, the issue is not properly before this court, and this argument is waived. RAP 10.3(a)(6); *Spino*, 1 Wn. App. at 732.

No. 59601-6-II

CONCLUSION

We hold that the trial court properly dismissed on summary judgment Kamani's outrage and fraud claims against Stone and AESC. Because the trial court properly dismissed the outrage and fraud claims, Kamani is not entitled to noneconomic and economic damages related to those claims. Moreover, the trial court properly dismissed the breach of contract claim because it was duplicative of Kamani's negligence claim. Finally, Kamani waived any argument regarding the trial court's denial of her motion for reconsideration. We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Cruser, C.J.

Che, J.

37